UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

BWP MEDIA USA, INC. d/b/a PACIFIC
COAST NEWS and NATIONAL PHOTO
GROUP, LLC,

                              Plaintiff,

              v.

GOSSIP COP MEDIA, LLC,

                              Defendant.

------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 26, 2015
```

13 Civ. 7574 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiff BWP Media USA Inc. d/b/a Pacific Coast News and National Photo Group, LLC ("Plaintiff" or "BWP Media") brings this action for copyright infringement against Defendant Gossip Cop Media, LLC ("Defendant" or "Gossip Cop").[1]  The case centers around three photographs and one video that Gossip Cop posted on its website without authorization from BWP Media.  Gossip Cop claims that it is in the business of providing media commentary, and moves to dismiss the case for failure to state a claim upon which relief can be granted on the basis that the reproduction of all four images are protected by the doctrine of fair use.  In addition, Gossip Cop asserts that Plaintiff has

---

[1]     Plaintiff initially, and in its Amended Complaint, named Abrams Research, LLC d/b/a Abrams Media ("Abrams") as an additional defendant.  On consent of the parties, the Court dismissed the claim with prejudice as against Abrams, provided that Abrams reserved the right to seek additional remedies.  (Dkt. #17).  On March 18, 2014, Abrams moved for attorney's fees pursuant to 17 U.S.C. § 505 (Dkt. #21), which motion is denied in a separate opinion (Dkt. #41).

neither obtained registration with the U.S. Copyright Office nor had its application denied with respect to one of the four images.  For the reasons set forth in this Opinion, Defendant's motion to dismiss is granted with respect to that one image and denied with respect to the remaining three images.

## BACKGROUND

**A.    Factual Background**[2]

**1.    The Parties**

Plaintiff BWP Media "provide[s] entertainment-related photojournalism goods and services and own[s] the rights to a multitude of photographs and videos featuring celebrities, which it licenses to online and print publications." (Am. Compl. ¶ 1).  BWP Media obtains copyright registrations covering many of these photographs and videos, and additionally has pending copyright applications as to others.  (*Id.*).  BWP Media alleges that it is the legal and beneficial owner of these photographs and videos, and creates or obtains the photographs and videos "with the express purpose of licensing [them] to media organizations."  (*Id.* at ¶¶ 11, 13).

Defendant Gossip Cop operates for profit a website, gossipcop.com, which focuses on celebrity gossip news.  (Am. Compl. ¶¶ 2, 21-22).  Plaintiff

---

[2]    The facts contained in this Opinion are drawn from the Amended Complaint ("Am. Compl.") (Dkt. #13), and are taken as true for purposes of the pending motion to dismiss.  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (when reviewing a complaint for failure to state a claim, the court will "assume all well-pleaded factual allegations to be true" (internal quotation marks omitted)).

For convenience, Defendant's memorandum in support of its motion to dismiss or for summary judgment is referred to as "Def. Br." (Dkt. #25); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #31); and Defendant's reply brief as "Def. Reply" (Dkt. #37).

alleges that Gossip Cop operates its site for "the exact same commercial purpose as used by similar celebrity gossip organizations." (*Id.* at ¶¶ 28, 31, 33). Gossip Cop at times copies images in their entirety from other websites without independently licensing the images from their owners, in this case BWP Media. (Am. Compl. ¶ 23).

### 2.  The Images and Their Allegedly Infringing Uses

Plaintiff identifies four images that Defendant reproduced on its website.[3] All four images are legally and beneficially owned by Plaintiff, and Defendant did not receive authorization or permission before reproducing them.

The first image is a photograph of the actors Mila Kunis and Ashton Kutcher holding between them one newspaper and three cups of coffee while walking down a street. (*See* Am. Compl., Ex. 1 (the "Kunis/Kutcher Image")). The Amended Complaint indicates that the image is registered with the registration number VA0001848281. (*Id.*). As reproduced on Gossip Cop's website next to a January 28, 2013 article entitled "Mila Kunis and Ashton Kutcher 'Moving to London,' Claims Tab," the Kunis/Kutcher Image appears with the headline from *The Sun*, reading "AK & MK in UK," and below that "Ashton Kutcher and Mila Kunis are moving to London." (*See* Def. Br., Ex. B (the "Kunis/Kutcher Article")).   Below the picture of the photograph and headline appears a parenthetical attribution to *The Sun*. (*Id.*). The

---

[3]  The Amended Complaint alleges that this and other images appear as thumbnails in search and archive results as well. (*See* Am. Compl., Ex. 1). Neither party addresses whether the use in search results should be analyzed distinctly, and the question is not relevant to the disposition of the instant motion.

Kunis/Kutcher Article excerpts portions of *The Sun*'s article, provides a contradictory quote from "a close Kunis insider," and assigns the story the lowest score, a "0," on its scale of "Rumor" to "Real."  (*Id.*).

The second image is a photograph of the actor Robert Pattinson slumped over behind the wheel of a car.  (*See* Am. Compl., Ex. 1 (the "Pattinson Image")).  The Amended Complaint indicates that the image is registered with the registration number VA0001865159.  (*Id.*).  As reproduced on Gossip Cop's website next to a May 13, 2013 article entitled "Robert Pattinson, Katy Perry Partying at Chateau Marmont Before His Birthday?", the Pattinson Image appears with a parenthetical attribution to the website *HollywoodLife*.  (*See* Def. Br., Ex. C (the "Pattinson Article")).  It includes *HollywoodLife*'s headline ("Robert Pattinson Parties With Katy Perry Before His Birthday — PIC"), caption ("Robert Pattinson looking tired leaves Chateau Marmont on May 9, 2013."), circular insert of Katy Perry's face, and evidently enticing offer to "Click To See More Pics Of Rob."  (*Id.*).  The Pattinson Article recounts portions of *HollywoodLife*'s article with accompanying contradictory evidence, such as noting that "[t]he Chateau Marmont is NOT a 'club,' it's a hotel with cool lounge areas inside the lobby and outdoors," as well as that the original source of the information, *PopSugar*, subsequently recanted the story.  (*Id.*).  Gossip Cop gives the *HollywoodLife* story a score of "0" on the Rumor to Real scale.  (*Id.*).

The third image is a photograph of the model and actress Liberty Ross in stride.  (*See* Am. Compl., Ex. 1 (the "Ross Image")).  The Amended Complaint indicates that the image is registered with the registration number

VA0001836367.  The photograph appears on Gossip Cop's website with a watermark and parenthetical attribution to the website *TMZ*, side-by-side with an also-watermarked close-up of the same image focused on her left hand, where no wedding ring is evident.  (*See* Def. Br., Ex. D (the "Ross Article")).  The August 7, 2012 Ross Article, entitled "Rupert Sanders Wife Liberty Ross Spotted Without Wedding Ring (PHOTO)," states that Ross "was spotted without her wedding ring in Los Angeles on Monday."  (*Id.*).  The unattributed article, apparently authored by Gossip Cop, goes onto to offer the reader a brief primer on then-recent marital difficulties experienced by Ross and Sanders, and labels the article a "10" on its Rumor to Real scale.  (*Id.*).  At no point does the text of the article reference any other publication or news source.  (*Id.*).

The fourth image is a video of Gwyneth Paltrow on a Vespa scooter with a child on the backseat, pulling into a lane ahead of an approaching school bus that quickly brakes, before Ms. Paltrow is followed by her now-estranged husband Chris Martin, also toting a child on the backseat of his Vespa scooter. (*See* Am. Compl., Ex. 1 (the "Paltrow Image")).[4]  The video appears with "NPG.COM" in the bottom-right corner, and appears through the embedded video player of *TMZ*, which includes a link to the latter organization's website. (*Id.*).  The video appears on Gossip Cop's website beneath a brief September 9, 2013 article entitled "Gwyneth Paltrow Cuts Off School Bus in Vespa Scooter

---

[4]     The Amended Complaint and the Defendant's Brief include only a still image of the video, but its full contents remain widely available, including on Defendant's website. *See* Daniel Gates, *Gwyneth Paltrow Cuts Off School Bus in Vespa Scooter (VIDEO)* (Sept. 9, 2013, 2:01 PM), http://www.gossipcop.com/gwyneth-paltrow-scooter-video-school-bus-vespa/.

(VIDEO)." (*See* Def. Br., Ex. E (the "Paltrow Article")).  The unattributed Paltrow Article, apparently authored by Gossip Cop, describes the contents of the video, but mentions no other news organizations and does not feature its traditional Rumor to Real scale.  (*Id.*).  The Amended Complaint indicates that a copyright application was filed on September 10, 2013, shortly prior to the Complaint in the instant litigation, with the application number 1-991548211 (Am. Compl., Ex. 1), but that the application had not been either accepted or rejected as of the filing of Plaintiff's opposition brief (Pl. Opp. 2).[5]

## B.   Procedural History

Plaintiff filed its initial Complaint on October 25, 2013.  (Dkt. #1).  In lieu of filing a response, and in accordance with this Court's Individual Rules of Practice, Defendant filed a letter requesting a pre-motion conference for its anticipated motion to dismiss.  (Dkt. #11).  The Court denied the request with leave to renew in order to first allow Plaintiff to file its anticipated Amended Complaint, which it did on February 3, 2013.  (Dkt. #13).  As agreed to at the conference of March 4, 2014, Defendant filed its motion to dismiss on March 21, 2014, arguing that all of the images were protected by the "fair use" doctrine, and additionally that Plaintiffs could not bring a claim for infringement of the Paltrow Image because their application with the Copyright

---

[5]    A search of the U.S. Copyright's registration records conducted at the time of publication did not turn up a registration record for the Paltrow Image.  *See* Public Catalog Search, U.S. Copyright Office, http://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?Search_Arg=National+Photo+Group&Search_Code=NALL&PID=tkXm AhbkK7UsRr_KvYzwEPz2XSnUP&SEQ=20150126141709&CNT=25&HIST=1 (last visited Jan. 26, 2015).

Office was still pending.  (Dkt. #24).  Plaintiff filed its brief in opposition on April 28, 2014 (Dkt. #29), and the briefing was complete upon the filing of Defendant's reply brief on May 16, 2014 (Dkt. #37).  The Court now considers the motion to dismiss.

## DISCUSSION

### A.    The Standard for a Motion to Dismiss

When considering a motion to dismiss for failure to state a claim, a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks omitted)).  A plaintiff is entitled to relief if she alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" (quoting *Twombly*, 550 U.S. at 570)).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

7

"In considering a motion to dismiss for failure to state a claim pursuant
to Rule 12(b)(6), a district court may consider the facts alleged in the
complaint, documents attached to the complaint as exhibits, and documents
incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable LLC*, 622
F.3d 104, 111 (2d Cir. 2010). "Even where a document is not incorporated by
reference, the court may nevertheless consider it where the complaint 'relies
heavily upon its terms and effect,' which renders the document 'integral' to the
complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)
(quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d
Cir. 1995) (per curiam)). "[A] plaintiff's *reliance* on the terms and effects of a
document in drafting the complaint is a necessary prerequisite to the court's
consideration of the document on a dismissal motion; mere notice or
possession is not enough." *Id.* (emphasis in original). Because Plaintiff relies
upon Defendant's allegedly infringing webpages, and includes screen captures
of them, in the Amended Complaint (*see* Am. Compl., Ex. 1), the Court
incorporates these documents — displayed in greater detail in Exhibits B
through E of Defendant's opening brief — by reference.

**B.   Application**

### 1.   The Motion to Dismiss Is Granted with Respect to the Paltrow Image

Although registration is not required to obtain copyright protection, *see*
17 U.S.C. § 408(a), it is a prerequisite to bringing an infringement action in
federal court, *see id.* § 411(a). *But see Reed Elsevier, Inc.* v. *Muchnick*, 559 U.S.
154, 171 (2010) ("We … decline to address whether § 411(a)'s registration

8

requirement is a mandatory precondition to suit that … district courts may or should enforce *sua sponte* by dismissing copyright infringement claims involving unregistered works.").  As Plaintiff points out, the Second Circuit has not decided whether a pending application for copyright satisfies the registration requirement of § 411(a).  *See Psihoyos* v. *John Wiley & Sons, Inc.*, 748 F.3d 120, 125 (2d Cir. 2014) ("[T]he Federal Courts of Appeals are divided over whether a pending application satisfies § 411(a)'s requirement of copyright registration as a precondition to instituting an infringement action….  We need not resolve the dispute or otherwise embroil ourselves in this circuit split." (internal citations omitted)).

However, the most exhaustive recent analysis within this District concluded that "Courts in this Circuit have … required that a plaintiff either hold a valid copyright registration outright or have applied and been refused a registration *prior* to filing a civil claim, both before and after *Reed Elsevier.*  A pending application does not suffice." *Muench Photography, Inc.* v. *Houghton Mifflin Harcourt Pub. Co.*, No. 09 Civ. 2669 (LAP), 2012 WL 1021535, at *5 (S.D.N.Y. Mar. 26, 2012).  It has since been noted that "[c]ourts in this district generally hold that a copyright registration is required, and that a pending application will not do." *BWP Media USA Inc.* v. *Hollywood Fan Sites, LLC*, No. 14 Civ. 121 (JPO), 2014 WL 6077247, at *5 n.6 (S.D.N.Y. Nov. 14, 2014); *accord Int'l Diamond Importers, Inc.* v. *Oriental Gemco (N.Y.), Inc.*, No. 14 Civ. 3506 (SAS), 2014 WL 6682622, at *11 (S.D.N.Y. Nov. 24, 2014) ("I agree that an application is not sufficient to bring an infringement action[.]"); *Accurate*

*Grading Quality Assur., Inc.* v. *Thorpe*, No. 12 Civ. 1343 (ALC), 2013 WL 1234836, at *7 (S.D.N.Y. Mar. 26, 2013) (same).   Plaintiff provides only a single example to the contrary.  (*See* Pl. Opp. 17 (citing *Well-Made Toy Mfg. Corp.* v. *Goffa Int'l Corp.*, 210 F. Supp. 3d 147, 157 (E.D.N.Y. 2002))).  The Court agrees with the overwhelming majority of courts in this District and Circuit that a pending application does not constitute "registration" sufficient to allow suit for copyright infringement under 17 U.S.C. § 411(a).

Accordingly, since Plaintiff's application for registration of the Paltrow Image was pending as of the filing of the Complaint, the Amended Complaint, and this Opinion, the motion to dismiss must be granted with respect to the Paltrow Image.  The Court need not at this time address the question of whether Plaintiff should be allowed to amend its complaint to include the Paltrow Image once the Copyright Office grants or rejects the application for registration.

### 2.    The Motion to Dismiss Is Denied with Respect to the Other Images

Gossip Cop moves to dismiss the remainder of the Amended Complaint on the basis that the defense of fair use prevents any claim of infringement. Based upon the allegations in the Amended Complaint and the materials incorporated by reference therein, the Court is unable to conclude that Plaintiff fails to state a claim upon which relief can be granted.  The Court declines to find that fair use constitutes a complete defense at this stage.

The Copyright Act is intended "[t]o promote the Progress of Science and useful Arts," U.S. Const. art. I, § 8, cl. 8, "by granting authors a limited

monopoly over (and thus the opportunity to profit from) the dissemination of their original works of authorship," *Authors Guild, Inc.* v. *HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014).  But there are also limits upon creators' control over their own works, in particular "the doctrine of 'fair use,' which allows the public to draw upon copyrighted materials without the permission of the copyright holder in certain circumstances."  *Id.*  "[T]he fair use determination is an open-ended and context-sensitive inquiry," *Cariou* v. *Prince*, 714 F.3d 694, 705 (2d Cir. 2013), but Congress has provided four nonexclusive factors that inform whether a given use is fair:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

Although "[t]he determination of fair use is a mixed question of fact and law," *Swatch Grp. Mgmt. Servs. Ltd.* v. *Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014), the Second Circuit has endorsed the resolution of other copyright questions at the pleadings stage by analyzing the complaint and incorporating by reference the documents referred to therein, *see Peter F. Gaito Architecture, LLC* v. *Simone Dev. Corp.*, 602 F.3d 57, 63-65 (2d Cir. 2010) (analyzing a dismissal based upon lack of substantial similarity between copyrighted and

allegedly infringing work).  And the Second Circuit has approvingly cited the

Seventh Circuit's discussion of the fair use inquiry at the motion to dismiss

stage.  *See Cariou*, 714 F.3d at 707 (discussing *Brownmark Films, LLC* v.

*Comedy Partners*, 682 F.3d 687 (7th Cir. 2012)).  The *Brownmark* court

determined that in certain circumstances, "the only two pieces of evidence

needed to decide the question of fair use … are the original version" and the

allegedly infringing work, and found that this analysis could be conducted

pursuant to a motion to dismiss under Rule 12(b)(6) or 12(c), without

converting the motion into one for summary judgment pursuant to Rule 12(d).

*Brownmark*, 682 F.3d at 690.  While the Second Circuit has noted in the

context of the Lanham Act that "[b]ecause fair use is an affirmative defense, it

often requires consideration of facts outside of the complaint and thus is

inappropriate to resolve on a motion to dismiss," it recognized that

"[a]ffirmative defenses may be adjudicated at this stage in the litigation,

however, where the facts necessary to establish the defense are evident on the

face of the complaint."  *Kelly-Brown* v. *Winfrey*, 717 F.3d 295, 308 (2d Cir.

2013).  The Court thus finds that it is possible to resolve the fair use inquiry on

a motion to dismiss under certain circumstances, but observes that there is a

dearth of cases granting such a motion.  *See, e.g.*, *M. Shanken Commc'ns, Inc.*

v. *Cigar500.com*, No. 07 Civ. 7371 (JGK), 2008 WL 2696168, at *10 (S.D.N.Y.

July 7, 2008) (noting that a similarly situated defendant could not identify "any

cases in this Circuit that have granted a motion to dismiss on the grounds of

fair use").  Nonetheless, given the possibility, however slim, of resolution at this

stage, the Court will undertake a review of the three remaining images in light of the fair use factors.

### a. The Purpose Factor Weighs in Defendant's Favor with Respect to the Kunis/Kutcher and Pattinson Images, and in Plaintiff's Favor with Respect to the Ross Image

The first factor in the fair use inquiry, which has been described as "[t]he heart of the fair use inquiry," *Cariou*, 714 F.3d at 705 (alterations in original) (quoting *Blanch* v. *Koons*, 467 F.3d 244, 251 (2d Cir. 2006)) (internal quotation marks omitted), asks in part whether the new work "merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative,'" *Campbell* v. *Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (quoting *Folsom* v. *Marsh*, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841) (Story, J.)); Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)). The Second Circuit has recognized, however, that

> [i]n the context of news reporting and analogous activities,… the need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration. Courts often find such uses transformative by emphasizing the altered purpose or context of the work, as evidenced by surrounding commentary or criticism.

*Swatch*, 756 F.3d at 84. Yet the Second Circuit has specifically rejected the contention that commentary is necessary to the fair use defense, holding that "[t]he law imposes no requirement that a work comment on the original or its author in order to be considered transformative." *Cariou*, 714 F.3d at 706.

13

"Instead,... to qualify as a fair use, a new work generally must alter the original with 'new expression, meaning, or message.'" *Id.* (quoting *Campbell*, 510 U.S. at 579).

The commercial nature of the secondary use is also relevant; "[t]he greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair." *Swatch*, 756 F.3d at 83 (alteration in original) (quoting *Am. Geophysical Union* v. *Texaco Inc.,* 60 F.3d 913, 922 (2d Cir. 1994)) (internal quotation marks omitted); *accord Harper & Row Publishers, Inc.* v. *Nation Enters.*, 471 U.S. 539, 562 (1985) ("The fact that a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding of fair use."). On the other hand, "purposes such as criticism, comment, [and] news reporting" are set forth in the Copyright Act as prototypical examples of fair use, 17 U.S.C. § 107, and the Second Circuit has "recognized that '[a]lmost all newspapers, books and magazines are published by commercial enterprises that seek a profit.'" *Swatch*, 756 F.3d at 83 (alteration in original) (quoting *Consumers Union of U.S., Inc.* v. *Gen. Signal Corp.,* 724 F.2d 1044, 1049 (2d Cir. 1983)).  Accordingly, though a work may be commercial in nature, where it is found to be transformative courts "do not place much significance on that fact due to the transformative nature of the work." *Cariou*, 714 F.3d at 708.

Defendant's use of the copyrighted work is undoubtedly commercial in nature.  Plaintiff adequately pleads as much (*see* Am. Compl. ¶¶ 22, 24, 28-

14

30), and Defendant does not contest that fact; rather, it simply urges that "the fact that Gossip Cop is a for-profit entity should be afforded little-to-no weight or significance by this Court" (Def. Br. 20). Yet "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562. The question of Gossip Cop's motive is a factual one, making it inappropriate for dismissal at this stage. However, there is certainly enough in the complaint to suggest that at least some of the uses — and perhaps Gossip Cop's business model as a whole — is meant to allow Gossip Cop to till the same ground as other publications without paying the customary licensing fee.[6] On the other hand, the heart of the inquiry on the first factor is whether the use is transformative, not whether it is profitable. *See Cariou*, 714 F.3d at 708.

BWP Media asserts that Gossip Cop is simply another tabloid engaged in precisely the same kind of celebrity gossip reporting as the outlets to which BWP Media licenses its images. This allegation, normally automatically credited, is somewhat belied by the nature of the Gossip Cop articles that are incorporated into the Amended Complaint by reference. Although Gossip Cop

---

[6] This inquiry is at times regarded as questioning the alleged infringer's good faith. As the Second Circuit has noted, "[m]uch has been written about whether good faith was de-emphasized by the advent of *Campbell* or essentially written out of the first part of the fair-use test." *Blanch*, 467 F.3d at 255. There is more in the Amended Complaint to suggest bad faith than was present in *Blanch*, but as the *Blanch* court observed, to the extent the bad faith element is still part of the inquiry, it boils down to whether the use was otherwise fair in the absence of permission. *Id.* at 256.

is, broadly speaking, in the same celebrity journalism business as other outlets, the Kunis/Kutcher Image and the Pattinson Image are utilized in a different context on Gossip Cop's website than in the publications from which the images are copied.  Gossip Cop makes clear, including by copying the headlines that ran with the images, that the images were used to illustrate or bolster the stories run by *The Sun* and *HollywoodLife*, and proceeds to attack the factual bases of these stories.[7]  Such "surrounding commentary or criticism" clearly militates for a finding of transformative use.  *Swatch*, 756 F.3d at 84.  And while Gossip Cop may be a far cry from Woodward and Bernstein, "the fact that the story is admittedly on the tawdry side of the news ledger does not make it any less of a fair use."  *Nunez* v. *Caribbean Int'l News Corp.*, 235 F.3d 18, 22-23 (1st Cir. 2000).

On the other hand, the Ross Image contains no surrounding commentary or criticism of the underlying source of the image, and the Ross Article makes no mention whatsoever of another publication.  It is not enough for an image to be used in the course of news reporting; the use must be transformative.  *See Harper & Row*, 471 U.S. at 561 ("The fact that an article arguably is 'news' and therefore a productive use is simply one factor in a fair use analysis.").  Similarly, the mere appending of the Rumor to Real scale to a story that uses the image for the exact same purpose as its original location does not

---

[7]     Plaintiff argues that the images do not perfectly illustrate the content of Gossip Cop's stories.  (*See* Am. Compl. ¶¶ 15-16).  While this argument may be a valid critique of the journalistic savvy of the outlets to which BWP Media *did* license its photographs, it is irrelevant to the question of whether reproduction of the original publishers' headlines and cover photographs helped provide context to Gossip Cop's criticism of those outlets.

transform it from celebrity journalism to commentary on celebrity journalism. Plaintiff's citation to *Mathieson* v. *Associated Press*, No. 90 Civ. 6945 (LMM), 1992 WL 164447 (S.D.N.Y. June 25, 1992) (Pl. Opp. 7), is inapposite. Whereas in that case the Associated Press copied a photo from a business promotion brochure to illustrate a news story, *id.* at *3, in this case Gossip Cop reproduced the photo in precisely the same context in which it was originally deployed. Taking the allegations in the Amended Complaint as true, the Court must conclude that the first fair use factor weighs in Defendant's favor with regard to the Kunis/Kutcher and Pattinson Images, and in Plaintiff's favor with regard to the Ross Image.

### b.      The Nature of the Copyrighted Work Factor Is Mixed

The second fair use factor is "the nature of the copyrighted work." 17 U.S.C. § 107. The Supreme Court has interpreted this factor to incorporate two primary inquiries: whether the work is factual or fictional, and whether the work is unpublished. The Second Circuit has elaborated, calling for a consideration of "(1) whether the work is expressive or creative, ... with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Cariou*, 714 F.3d at 709-10 (alterations in original) (quoting *Blanch*, 467 F.3d at 256) (internal citation and quotation marks omitted). Regarding the former, "[t]he law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row*, 471 U.S. at 563; *accord Authors*

*Guild*, 755 F.3d at 96 ("The second factor considers whether the copyrighted work is 'of the creative or instructive type that the copyright laws value and seek to foster.'" (quoting Leval, *supra*, at 1123)).  Regarding the latter, "[t]he fact that a work is unpublished is a critical element of its 'nature.'"  *Harper & Row*, 471 U.S. at 564.  Due to the importance of the author's right of first publication, "the unpublished nature of a work is a key, though not necessarily determinative, factor tending to negate a defense of fair use."  *Id.* at 554 (internal alterations, citation, and quotation marks omitted).

Regarding the first element, Plaintiff asserts that its images are "original, creative works" that "typically provide little if any informational value."  (Am. Compl. ¶¶ 12, 14).  Though the Court is bound to accept the factual allegations in the Amended Complaint is true, "[t]he Court is not, however, bound to accept … 'legal conclusions masquerading as factual conclusions.'"  *Elsevier, Inc.* v. *Grossman*, No. 12 Civ. 5121 (KPF), 2015 WL 72604, at *5 (S.D.N.Y. Jan. 5, 2015) (quoting *Rolon* v. *Hennenman,* 517 F.3d 140, 149 (2d Cir. 2008)).  Many courts have expressed trepidation at characterizing photographs as either factual or creative.  *See Balsley* v. *LFP, Inc.*, 691 F.3d 747, 760 (6th Cir. 2012) (noting, in the course of upholding the reasonableness of a jury's finding, that "photographs have varying degrees of creativity"); *Nunez*, 235 F.3d at 23 ("Given the difficulty of characterizing the 'nature' of the photographs, we find that the impact of their creativity on the fair use finding is neutral.").  As in *Balsley*, the creativity of the images at issue is mixed; while a paparazzi photographer does "not direct [the subject] or create the background for the

18

images," he does "ha[ve] control over the exposure of the film (i.e., shutter speed and flash settings), use[] his artistic skill to edit the pictures for size, color, and clarity, and [choose] which images to publish based on the allurement of the subject." 691 F.3d at 760. Though the Court suspects that the Pattinson and Ross Images are intended to inform the viewer by scandalous implication rather than cause aesthetic appreciation of the lighting choices, given the procedural posture of the case Plaintiff has at least plausibly suggested that the images at issue constitute creative works.

The second element of this factor — whether the copyrighted work was previously published — favors Defendant, since Plaintiff acknowledges that the images were taken from outlets where they had previously been published. Yet while Defendant has not impeded Plaintiff's right to control first publication, overemphasis of publication status in the fair use analysis would be "in tension with the Copyright Act's express grant to copyright holders of rights over derivative works." *Blanch*, 467 F.3d at 252 n.4. Given the procedural posture of the case, the Court declines to award significant weight to the second factor in favor of either party.

### c.        The Amount and Substantiality Factor Favors Plaintiff

The third factor in the fair use inquiry is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107. In examining this factor courts consider "the proportion of the original work used, and not how much of the secondary work comprises the original." *Cariou*, 714 F.3d at 710; *accord Harper & Row*, 471 U.S. at 565. Ultimately,

19

"[t]he question is whether 'the quantity and value of the materials used, are reasonable in relation to the purpose of the copying.'" *Blanch*, 467 F.3d at 257 (quoting *Campbell*, 510 U.S. at 586) (internal quotation marks omitted).  As courts have repeatedly emphasized, the inquiry "calls for thought not only about the quantity of the materials used, but about their quality and importance, too." *Campbell*, 510 U.S. at 587; *accord, e.g.*, *Hollander* v. *Steinberg*, 419 F. App'x 44, 47 (2d Cir. 2011) (summary order) (finding reasonable a complete reproduction for the purposes of litigation).

Gossip Cop "copied and displayed [Plaintiff's images] in their entirety." (Am. Compl. ¶ 25).  The Court declines to resolve at this stage whether the Kunis/Kutcher and Pattinson Images were necessary to their respective articles; however, their use therein — copied with their original headlines — suggests that they were used "to convey the 'fact' of the photograph to viewers," *Blanch*, 467 F.3d at 257, a purpose for which copying the entirety may have been reasonable.  Certainly cropping the Pattinson Image would have required alteration or omission of some of the surrounding elements that *HollywoodLife* placed around the image, perhaps diminishing the force of the critique leveled by Gossip Cop in the Pattinson Article.  Plaintiff's argument is significantly stronger with regard to the Ross Image, which was used to exactly the same extent and to convey precisely the same information as in its original publication.  Given the deference owed to Plaintiff's allegations, the Court finds that, due to the complete reproduction of the copyrighted images, the third fair use factor weighs in Plaintiff's favor.

### d.     The Effect of the Use Factor Favors Plaintiff

The fourth and final enumerated factor in the fair use inquiry is "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107.  The Supreme Court has described this factor as "undoubtedly the single most important element of fair use."  *Harper & Row*, 471 U.S. at 566.  The Second Circuit has emphasized that "[t]he focus here is on whether defendants are offering a market substitute for the original.... [O]ur concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work."  *NXIVM Corp.* v. *Ross Inst.*, 364 F.3d 471, 481-82 (2d Cir. 2004).  Accordingly, there is a difference between a parody or critique that harms the market for the original work by devaluing it in the eyes of audiences, and a copy that usurps the market by offering a substitute good.  *See Campbell*, 510 U.S. at 591-92.

Plaintiff alleges that Gossip Cop operates in precisely the same market as the organizations to which Plaintiff licenses its images, and that Gossip Cop's practices — if widespread — would destroy that market by reducing the value of a purportedly exclusive license.  (*See* Am. Compl. ¶¶ 33-34).  Defendant responds that it operates in a "unique, transformative news reporting market." (Def. Br. 22).  In effect, the Court is asked to decide whether there is a market for evaluation of celebrity journalism as distinct from the primary celebrity journalism market.  Given the nature of this inquiry, the Court must credit Plaintiff's allegations at this stage to the extent they are factual in nature.

Moreover, the Second Circuit has held that a report on and evaluation of a copyrighted work can, by reproducing the original with overzealous detail and completeness, stray beyond the bounds of fair use: "It is possible that a person who had missed an episode of 'Twin Peaks' would find reading the Book an adequate substitute, and would not need to rent the videotape of that episode in order to enjoy the next one." *Twin Peaks Prods., Inc.* v. *Publications Int'l, Ltd.*, 996 F.2d 1366, 1377 (2d Cir. 1993).  Similarly, it is possible that a person who had missed *TMZ*'s initial report on Liberty Ross's jewelry choices would find Gossip Cop's Ross Article to be an adequate substitute, and would thus deprive *TMZ* (and by extension BWP Media) of a portion of its market. Accordingly, the Court finds that this factor weighs in Plaintiff's favor.

## CONCLUSION

Because Plaintiff's application for registration of the Paltrow Image has neither been accepted nor rejected, Defendant's motion to dismiss is GRANTED with regard to claims based upon that image.

With regard to the remaining images, Defendant's case for the fair use defense is significantly stronger for the Kunis/Kutcher and Pattinson Images than for the Ross Image.  Yet even if the use of the former images is transformative — a difficult determination to make at this stage — the other factors vary from neutral to favoring Plaintiff.  Under such conditions, the motion to dismiss is DENIED as to the remaining images.

The Clerk of Court is directed to terminate Docket Entry 24, and the parties are directed to appear before the Court for a status conference on

**February 20, 2015, at 2:00 p.m.**  The parties are further directed to submit a joint status letter and Proposed Civil Case Management Plan and Scheduling Order, the template of which is available on the Court's website, no later than **February 12, 2015**.

   SO ORDERED.

Dated:   January 26, 2015
         New York, New York

   _____
   KATHERINE POLK FAILLA
   United States District Judge