UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                 :

BWP MEDIA USA, INC.,           :
                                 :

                Plaintiff,    :

                                 :

            v.               :

                                 :

GOSSIP COP MEDIA, INC.,    :
                                 :

                Defendant.  :

                                 :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 20, 2016

13 Civ. 7574 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

      Plaintiff BWP Media USA Inc. filed this action against Defendant Gossip

Cop Media, LLC alleging infringement of Plaintiff's copyright with respect to

three photographs and one video.  Pursuant to the Court's partial grant of

Defendant's Motion to Dismiss, only the claims regarding the three photos

remain at issue.  Following a non-jury trial held on June 6, 2016, the Court

now finds Defendant liable for infringement of Plaintiff's copyright as to each of

the three images.

<b>FINDINGS OF FACT</b>[1]

**A.**    **The Parties**

      Plaintiff BWP Media USA Inc. ("BWP Media" or "Plaintiff"), which does or

has done business as Pacific Coast News ("PCN") and National Photo Group,

---

[1]    The Court bases its findings on the affidavits and trial testimony provided by Plaintiff's witnesses John Calabrese and Ben Evenstad, and Defendant's witness Michael Lewittes, as well as the exhibits entered into evidence at trial.  For convenience, the Court will refer to witnesses' affidavits as "[Name] Aff."; Plaintiff's trial exhibits as "PTX"; Defendant's trial exhibits as "DTX"; and the trial transcript as "Tr."  Additionally,

LLC ("NPG"), owns the rights to a collection of photographs and videos of celebrities that it licenses to various print and online publications. (Evenstad Aff. ¶ 1; Calabrese Aff. ¶ 1). Defendant Gossip Cop Media ("Gossip Cop" or "Defendant") operates a for-profit website that presents celebrity gossip news and opines on the veracity of celebrity news stories published by unaffiliated third-party outlets. (Lewittes Aff. ¶¶ 2, 6).[2] Defendant subscribes to a photo database, Getty Images, from which it licenses many of the images used on its website. (Tr. 37:19-21, 40:12-15). However, Defendant will in some instances copy an entire image from another gossip website, without having first obtained its own license for that image. (*Id.* at 40:16-41:17, 78:4-19; Lewittes Aff. ¶ 14).

## B.    Defendant's Use of Plaintiff's Images

The three images at issue consist of a photograph of the actors Mila Kunis and Ashton Kutcher walking down the street (the "Kunis/Kutcher Image," PTX 1); a photograph of the actor Robert Pattinson slumped over in the seat of a car (the "Pattinson Image," PTX 2); and a photograph of the model Liberty Ross mid-stride, in which she appears not to be wearing her wedding ring (the "Ross Image," PTX 3). Capturing each image required a certain degree of technical skill and photographic experience, as the photographers needed to make determinations regarding elements such as timing, framing, light

---

Plaintiff and Defendant's post-trial briefs will be cited as "Pl. Br." (Dkt. #123) and "Def. Br." (Dkt. #124), respectively.

[2]    While evidence has not been entered explicitly setting forth the for-profit status of Defendant, this characterization of Defendant has been consistently presented by Plaintiff throughout this litigation and has never been contested by Defendant.

metering, shutter speed, lens and camera type, and depth of field.  (Calabrese Aff. ¶ 11; Evenstad Aff. ¶¶ 17, 27).

Defendant copied each of these photos from third-party celebrity gossip websites that had themselves licensed the images from Plaintiff; Defendant then posted "screen grabs" of the photos on its own site, adding to each an assessment of whether the story that accompanied the photo on the third-party website was "real" or "rumor," as displayed on a "real-to-rumor scale" posted alongside the image.  (Tr. 35:3-9, 37:7-11, 78:4-80:9; Lewittes Aff. ¶ 7).  Defendant calibrated this real-to-rumor scale based on information received from its own research and from confidential sources that Defendant's founder, Michael Lewittes, has cultivated over his years of experience in the celebrity news industry.  (Lewittes Aff. ¶¶ 10-11).  Defendant took the Kunis/Kutcher Image from the online version of the tabloid newspaper *The Sun*, which featured the picture in a story about Kunis and Kutcher moving to London; Defendant reported this story as rumor.  (PTX 13).[3]  Defendant took the Pattinson Image from the website Hollywood Life, which included the image as part of a story headlined "Robert Pattinson Parties With Katy Perry Before His

---

[3]     The Court finds Defendant's failure to submit into evidence a copy of the article from which the Kunis/Kutcher Image was taken — or indeed of any of the source articles for the images at issue — to be puzzling, in light of Defendant's burden to show fair use.  More mystifying still is Defendant's active objection to Plaintiff's attempt to submit a copy of the *Sun* article as an exhibit to its post-trial brief (*See* Dkt. #125); one would expect Defendant to embrace this evidence, which is necessary to support Defendant's theory of transformative use.

In any event, the Court need not rely on Plaintiff's belatedly-submitted exhibit: The Court will take judicial notice of the January 28, 2013 article in *The Sun*, as that article is publicly accessible and the facts of its existence and contents are readily ascertainable (though the *truth* of its contents are, quite clearly, up for debate).  *See* Fed. R. Evid. 201.

Birthday"; Defendant reported this story as rumor.  (PTX 14).  Finally, the Ross
Image was taken from the website TMZ; Defendant made no comment on the
story published by TMZ, but deemed it "real" on the accompanying "real-to-
rumor" scale.  (PTX 15).

The text accompanying the Kunis/Kutcher and Pattinson Images on
Defendant's website included the headline under which those respective images
were displayed on the third-party websites.  (Tr. 46:25-47:4; PTX 1-2).
Because Defendant's purpose is to "debunk" false celebrity gossip and thereby
foster more accurate celebrity news, it does not include weblinks to the false
stories (i.e., those closer to "rumor" on the aforementioned scale) upon which it
reports.  (Tr. 65:7-18).  Defendant neither sought nor obtained permission from
Plaintiff or from the third-party websites prior to posting any of the images in
this case.  (Tr. 17:22-24, 18:25-19:4, 20:20-22).

## C.    Plaintiff's Business Practices

PCN regularly receives celebrity photographs from freelance
photographers with whom PCN has an ongoing relationship.  (Calabrese Aff.
¶¶ 2-3).  The photographers typically execute assignment agreements, granting
PCN exclusive license to the photos.  (*Id.* at ¶¶ 5-6).  In regard to the images at
issue in this case, the Kunis/Kutcher Image was photographed and assigned to
PCN by Edward Opinaldo (*see* PTX 10; Calabrese Aff. ¶ 10), and former PCN
employee John Calabrese personally submitted the copyright registration
application for that photo (Calabrese Aff. ¶¶ 10, 13).

4

NPG follows a similar process of receiving photos from freelance photographers and applying for registration certificates.  (Evenstad Aff. ¶¶ 1-2, 6, 10-14).  During the period relevant to this litigation, NPG employee Ben Evenstad was responsible for entering into assignment agreements with photographers, but did not himself file copyright applications; rather, he supervised the employee responsible for submitting those applications, Wendy Weiss, and provided missing information when needed.  (*Id.* at ¶ 3; Tr. 142:4-25, 144:1-145:5, 161:7-162:11).  Despite Evenstad's lack of direct involvement in the copyright application filing process, Weiss regularly used Evenstad's name in the "certification" field of submitted applications.  (Tr. 142:16-143:9).  Evenstad understood from discussions with NPG counsel that this was an appropriate manner of indicating certification.  (*Id.* at 141:24-142:3, 159:11-160:20).

Plaintiff filed registration applications corresponding to each of the photographs at issue.  (PTX 4-6).  From those applications and the corresponding certificates of registration, the Court finds that the Kunis/Kutcher Image application was submitted on January 5, 2013; the photograph was taken by Edward Opinaldo; PCN is the copyright claimant; and rights to the image were transferred "[b]y written agreement."  (PTX 4, 10).  The Pattinson Image application was submitted on June 27, 2013; the photo was taken by Zavar Manokian; NPG is the copyright claimant; and rights were transferred "[b]y written agreement."  (PTX 5, 11).  Finally, the Ross Image application was submitted on August 7, 2012; the photo was taken by Ivan

Mast and Bryan Killay; NPG is the copyright claimant; and rights were transferred "[b]y written agreement." (PTX 6, 12).

When submitting photographs to NPG, photographers were required to upload their pictures to a system that would automatically email a copy to both Evenstad and Weiss. (Tr. 146:24-147:2). After photographs were received, Weiss was responsible for uploading the works listed in a copyright application, and did so in accordance with specific conventions: NPG applied for copyright registrations on exclusive images in batches, organized by photographer, on a monthly basis. (Tr. 147:19-148:12). Hence, the title listed on the registration for the Pattinson Image, "Zavar Manokian May 2013 EXC Images," indicates that the images submitted with that application were exclusive images received from photographer Zavar Manokian in May 2013. The Pattinson Image was one such exclusive image submitted by Manokian in May 2013. (Evenstad Aff. ¶ 16).

In some cases, where a particularly large or valuable set of pictures was submitted by a photographer, that set would be registered on its own as opposed to as part of a monthly batch. (Tr. 166:6-10). This was the case for the set containing the Ross Image. For such single-day sets, NPG's naming convention involved using the date the photo was taken, a letter code indicating the editor who worked on the set, and a number to differentiate the various sets an editor worked on for a given day. (Tr. 165:5-16). The Ross Image was an original photo taken by Killay and Mast on August 6, 2012, and published by NPG on that same date. (Evenstad Aff. ¶ 26). Accordingly, the

6

designator in the title on the copyright application marked PTX 6, "080612C3," indicates a capture date of August 6, 2012, or 080612; the relevant editor's code letter, "C"; and that the photo set was the third set worked on by the editor for that day.  (Tr. 165:5-16).  The Ross Image was taken on August 6, 2012 and was in the third set edited by editor C; in other words, it would properly be contained in set 080612C3.  (*See id.* at 166:11-16).

## D.  Prior Publication of the Images

Plaintiff had received licensing fees for the three images in this case prior to Defendant's use of the photographs.  Specifically, US Magazine paid $1,000 for use of the Kunis/Kutcher Image (PTX 19); E! Online paid $4,000 for a "24 hour exclusive" license for the Pattinson Image (PTX 20); and Grazia UK magazine paid £375, or $589, for use of the Ross Image (PTX 21).[4]

## CONCLUSIONS OF LAW

## A.  Plaintiff Has Established Ownership and Infringement of the Copyrights at Issue

### 1.  Applicable Law

Copyright registration is a prerequisite to bringing suit for infringement under the Copyright Act.  17 U.S.C. § 411(a).  Additionally, to establish a claim of copyright infringement, "a plaintiff with a valid copyright must demonstrate

---

[4]    Plaintiff contends that it is entitled to $15,000 for Defendant's use of the Ross Image, a figure which, according to Plaintiff, represents five times the licensing fee for that image. (Pl. Br. 10; Dkt. #103 ¶ 129).  Plaintiff has provided no explanation for how it derived that number, let alone any evidence to support it.  Consequently, the Court uses the licensing fee set forth in the relevant licensing invoice submitted into evidence.  That invoice establishes that Plaintiff received a licensing fee of £375 for the Ross Image on August 20, 2012 (PTX 21); the Court takes judicial notice of the historical exchange rate for that date, $1.57/£1, and accordingly treats the fee received by Plaintiff as $589.

that: [i] the defendant has actually copied the plaintiff's work; and [ii] the copying is illegal because a substantial similarity exists between the defendant's work and the protect[a]ble elements of plaintiff's." *Peter F. Gaito Architecture, LLC* v. *Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010) (quoting *Hamil Am. Inc.* v. *GFI*, 193 F.3d 92, 99 (2d Cir. 1999)).

A certificate of registration from the U.S. Register of Copyrights constitutes *prima facie* evidence of the certificate holder's copyright ownership, as well as of the truth of the facts stated in the registration.  17 U.S.C. § 410(c); *see also Rogers* v. *Koons*, 960 F.2d 301, 306 (2d Cir. 1992).  The validity of a registration may be rebutted by proof of a certificate holder's fraud on the Copyright Office, though the party seeking to establish such fraud bears a "heavy burden." *Lennon* v. *Seaman*, 84 F. Supp. 2d 522, 525 (S.D.N.Y. 2000). A party asserting fraud must show that (i) the copyright application contains one or more factual misrepresentation, (ii) the inaccuracies were "willful or deliberate," and (iii) the Copyright Office relied on the misrepresentations.  *Id.* (citing *Whimsicality, Inc.* v. *Rubie's Costume Co.*, 891 F.2d 452, 455 (2d Cir. 1989); *accord Santrayall* v. *Burrell*, 993 F. Supp. 173, 176 (S.D.N.Y. 1998)).

### 2.    Plaintiff Has Established Copyright Ownership

Plaintiff has submitted three copyright registration certificates, one for each of the photographs here at issue.  The certificates create a rebuttable presumption of Plaintiff's copyright, as well as a rebuttable presumption that all facts stated in the certificate are true.  17 U.S.C. § 410(c).  Defendant does not appear to challenge this presumption as it applies to the Kunis/Kutcher

Image; Defendant claims, however, that in regard to the registration certificates filed by NPG for the Pattinson and Ross Images, the presumption of validity is vitiated by Plaintiff's fraud on the Copyright Office.  (*See* Def. Br. 1-5).  The Court disagrees.

Defendant argues that because Evenstad is listed as having certified the copyright registration applications, but in fact neither prepared nor reviewed those applications, the applications each contain a material misrepresentation and are consequently invalid.  (Def. Br. 2-3).  However, courts in this Circuit typically require that any misrepresentation be "willful or deliberate" in order to constitute fraud on the Copyright Office; here, any misrepresentation appears to have been in good faith.  Counsel for NPG advised Evenstad to list Evenstad as the certifying individual for copyright applications, regardless of who prepared them.  In reliance on this legal advice, Weiss listed Evenstad's name; this suggests no willful or deliberate misleading of the Copyright Office.  Consequently, Defendant has not established Plaintiff's fraud in obtaining its copyright registrations.

Defendant has additionally raised Plaintiff's failure to produce valid assignment agreements for two of the images as grounds for finding that Plaintiff has failed to carry its burden of proving copyright ownership.  *See* 17 U.S.C. § 204(a) ("A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.").  However, "[t]he

9

purpose of the writing requirement [for copyright assignments] is to resolve disputes between copyright owners and transferees about the status of the copyright.  Where there is no such dispute, it would be 'unwarranted to permit a third-party infringer to invoke section 204(a) to avoid suit for copyright infringement.'"  *Sunham Home Fashions, LLC* v. *Pem-Am., Inc.*, No. 02 Civ. 6284 (JFK), 2002 WL 31834477, at *7 (S.D.N.Y. Dec. 17, 2002) (quoting *Imperial Residential Design, Inc.* v. *Palms Dev. Group, Inc.*, 70 F.3d 96, 99 (11th Cir. 1995)), *aff'd,* 83 F. App'x 369 (2d Cir. 2003) (summary order); *see also Software for Moving, Inc.* v. *La Rosa Del Monte Exp., Inc.*, No. 08 Civ. 986 (JGK), 2009 WL 1788054, at *8 (S.D.N.Y. June 23, 2009) ("It is also well-established in this Circuit that where a transferor and transferee of a copyright do not dispute that the transfer was valid, an alleged third party infringer may not avoid liability by invoking [] § 204(a)'s requirement that the transfer agreement have been made in writing" (collecting cases)), *aff'd sub nom. Software for Moving, Inc.* v. *La Rosa Del Monte Express, Inc.,* 419 F. App'x 41 (2d Cir. 2011) (summary order).  Here, the creators of the images in question do not contest the validity of their assignments to Plaintiff, nor does Defendant assert that it itself received any transfers of rights.  Rather, Defendant raises Plaintiff's failure to produce written assignment agreements for two of the three photos solely to defend against Plaintiff's infringement claim, which it may not do.

Absent any other evidence to rebut the presumption of validity provided by Plaintiff's registration certificates, the certificates establish Plaintiff's ownership of the images listed therein.

### 3.      Plaintiff Has Established Defendant's Unauthorized Copying

The "unauthorized copying" prong of a copyright infringement claim requires either "substantial similarity" between the copyrighted work and that of the defendant, or evidence that the defendant copied more than a *de minimis* portion of the plaintiff's protected expression.  *Tufenkian Imp./Exp. Ventures, Inc.* v. *Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003).  Here, there is no dispute that Defendant directly copied the images wholesale from third-party websites; the images used by Defendant were not merely substantially similar, they were identical to the images licensed to the third-party sites.  The contested question is whether Plaintiff has shown that the images displayed on those third-party websites and copied by Defendant were in fact the same images for which Plaintiff holds valid copyrights.

Defendant argues that the scope of a copyright is defined by the image deposited along with the copyright application, and that here, Plaintiff has failed to produce the deposits that accompanied the relevant copyright applications.  Furthermore, in regard to the Pattinson and Ross Images, Plaintiff has failed to provide testimony from anyone with firsthand knowledge of what was deposited along with the respective applications for those photos; consequently, Defendant argues, Plaintiff cannot show infringement, as it has not established that the images copied by Defendant are in fact the images for which Plaintiff holds copyrights.

Plaintiff's failure to produce direct evidence of the images that were submitted along with its copyright applications is indeed disappointing.

Nevertheless, Plaintiff has submitted sufficient proof to satisfy, by a preponderance of the evidence, that the images copied by Defendant were in fact the images registered with the Copyright Office.

In regard to the Kunis/Kutcher Image, the Court credits Calabrese's identification of the image and his unrebutted testimony that he personally submitted that image for registration with the Copyright Office.  In regard to the Pattinson and Ross Images, the testifying witness, Evenstad, did not himself submit the copyright registration applications.  However, Federal Rule of Evidence 406 provides that evidence showing "an organization's routine practice may be admitted to prove that on a particular occasion the … organization acted in accordance with the … routine practice."  Furthermore, a "court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness."  Fed. R. Evid. 406.  Evenstad provided testimony regarding NPG's routine handling of copyright applications, sufficiently proving that the images at issue were in fact the images for which Plaintiff received certificates of copyright registration.

As set forth in the Court's findings of fact, *supra*, NPG used specific naming conventions when filing copyright applications, such that the title listed on an application readily identifies the specific photographs that were submitted with that application.  Evenstad identified the Pattinson and Ross Images as photographs that would have been submitted under the applications titled "Zavar Manokian May 2013 EXC Images" and "Liberty Ross leaves Office Building – 080612C3 20 images," respectively.  Thus, assuming — which the

Court may do, pursuant to Rule 406 — that Weiss followed NPG's regular business practice when submitting those applications, then the Pattinson and Ross Images would have been respectively submitted with the applications bearing those titles, and would be covered by the registration certificates subsequently issued.

Defendant admits to having directly copied the three contested images from third-party websites without authorization, and the evidence from Calabrese and Evenstad establishes that, presuming regular business practices were followed, the copied images were the same images submitted in conjunction with the copyright registration applications in evidence and for which copyright registration certificates were issued to Plaintiff.  Accordingly, Plaintiff has carried its burden of establishing infringement.

**B.     Defendant Has Failed to Carry Its Burden of Showing Fair Use as an Affirmative Defense as to the Three Images in Question**

### 1.     Applicable Law

The Copyright Act is intended "[t]o promote the Progress of Science and useful Arts," U.S. Const. art. I, § 8, cl. 8, "by granting authors a limited monopoly over (and thus the opportunity to profit from) the dissemination of their original works of authorship," *Authors Guild, Inc.* v. *HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014).  But there are also limits upon creators' control over their own works, in particular "the doctrine of 'fair use,' which allows the public to draw upon copyrighted materials without the permission of the copyright holder in certain circumstances."  *Id.*  "[T]he fair use determination is an open-ended and context-sensitive inquiry," *Cariou* v. *Prince*, 714 F.3d 694,

705 (2d Cir. 2013), though Congress has provided four nonexclusive factors that inform whether a given use is fair:

> (1)   the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2)   the nature of the copyrighted work;
>
> (3)   the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4)   the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

### 2.      Application of the Fair Use Factors

#### i.      Purpose and Character of Use

##### a.  Defendant's Use of the Kunis/Kutcher and Pattinson Images Was Not Transformative

The first of the fair use factors, which has been described as "[t]he heart of the fair use inquiry," *Cariou*, 714 F.3d at 705 (quoting *Blanch* v. *Koons*, 467 F.3d 244, 251 (2d Cir. 2006)) (internal quotation marks omitted), asks in part whether the new work "merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative,'" *Campbell* v. *Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (quoting *Folsom* v. *Marsh*, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841) (Story, J.) (internal citations omitted)); *see also* Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1111 (1990).  The Second Circuit has recognized that

> [i]n the context of news reporting and analogous activities, … the need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration. Courts often find such uses transformative by emphasizing the altered purpose or context of the work, as evidenced by surrounding commentary or criticism.

*Swatch Grp. Mgmt. Servs. Ltd.* v. *Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014).

Defendant contends that its use of the Kunis/Kutcher and Pattinson Images was transformative, as it used the photographs to comment on or critique the stories that originally accompanied those photographs. Significantly, the Court agrees with Defendant's application of fair use in theory; in other words, the Court recognizes that, in maintaining a website that serves as a proving ground for celebrity news coverage, Defendant will have occasion to present images that accompany the stories on which it is commenting under a fair use theory. The problem with respect to the three images at issue is that the usage described by Defendant does not accord with what Defendant actually did. Nowhere in its stories accompanying the Kunis/Kutcher or Pattinson Images does Defendant comment or report on the images in question, nor does it critique the source websites' use of those photos. It does not say, for instance, "*The Sun* presented this image as a picture of Kutcher and Kunis in London; that is incorrect, our sources tell us the photo was taken in New York." Defendant comments on the falsity of the

*stories* that appeared in *The Sun* and in Hollywood Life, respectively; it says nothing at all about the images having being misrepresented.

To be clear, the Court recognizes that, generally speaking, "[t]he law imposes no requirement that a work comment on the original or its author in order to be considered transformative." *Cariou*, 714 F.3d at 706. "Instead, … to qualify as a fair use, a new work generally must alter the original with 'new expression, meaning, or message.'" *Id.* (quoting *Campbell*, 510 U.S. at 579). Here, however, Defendant's sole, self-proclaimed purpose in using Plaintiff's images was as a means of commenting upon the veracity of third-party reports. The "new expression, meaning, or message" purportedly imbued by Defendant was a "debunking" of each source-website's presentation of a given image; yet nothing in Defendant's articles suggests that the images were misrepresented. A viewer could leave Defendant's website believing that the third-party sites reported false *stories*, but without any idea that the *images* were in any way relevant to the deception.

This failure to implicate the images themselves may derive from the fact that the underlying source sites did not, in fact, misrepresent the photographs in question. At least in regard to the Kunis/Kutcher Image, the story from which the image was taken does not make any reference to the image of Kunis and Kutcher, nor does the wording of the article imply that the photograph is intended as proof of the couple's purported move to London — rather, the photograph seems intended as a general illustration of the couple. The only element of the article even implicitly suggesting that the photo was taken in

London is the article's title, "AK & MK in UK"; but even then, the most one could reasonably infer is that the photograph was taken in London, where, *The Sun* reports, Kunis was then shooting a motion picture — a proposition that Defendant's article does not contest.  In short, *The Sun* does not characterize the Kunis/Kutcher Image as proof of the couple's purported relocation; accordingly, Defendant's use of the image is not relevant to its reporting on that alleged relocation — particularly absent any comment from Defendant regarding what that image does or does not depict.

As for the Pattinson Image, the original story accompanying that image was not submitted into evidence, and does not appear to be publicly available at this time; the Court questions how it can find "transformative" use if it cannot compare the original source's usage to that of Defendant.  Defendant's asserted argument, that it used the Kunis/Kutcher and Pattinson Images to report on the source websites' stories, requires the Court to find some recontextualization of the photographs by Defendant.  In respect to the Pattinson Image, no evidence has been presented regarding the original context of the photo, making such a finding impossible.

In short, Defendant's republication of the Kunis/Kutcher and Pattinson Images adds no new meaning or expression to the images; contributes no information to its articles; and is otherwise extraneous to its reporting function.  As a consequence, Defendant's use of the Kunis/Kutcher and Pattinson Images cannot be said to constitute transformative news reporting.

17

Rather, Defendant used the photographs to illustrate its stories, which is precisely the same use as that made by the source websites.[5]

### b. Defendant's Use of the Ross Image Was Not Transformative

Unlike Defendant's articles accompanying the Kunis/Kutcher and Pattinson Images, the article accompanying the Ross Image does not even mention the story upon which it is purportedly reporting. The sole references to TMZ, the site from which the Ross Image was taken, are the letters "TMZ" in parentheses below the photograph and a watermark on the image itself. No text from the TMZ article is referenced or cited; the existence of the TMZ article is not even acknowledged. In short, there is no conceivable way in which Defendant's story could be viewed as reporting on the veracity of the TMZ story.

---

[5] One might also argue that Defendant's use of the images was transformative insofar as it served to help readers identify the original story being commented upon. This reasoning fails, however, on several fronts: The Kunis/Kutcher Image was not central to (or even mentioned by) the underlying story, and was consequently unlikely to provide information useful for identifying the underlying article beyond that already provided by reference to the article's headline, text, and publisher. Additionally, multiple outlets licensed and used the Kunis/Kutcher Image, making it further unlikely that the image would be particularly useful in identifying the specific story being commented upon. (*See* PTX 19, 30-31, 36, 37). Finally, the purpose of Defendant's website is to correct false reports presented by third parties; Defendant explicitly did not want to aid readers in locating the underlying story, and consciously chose not to link to the *Sun* article for that very reason. (Tr. 65:8-22). Hence this is a far cry from the scenario in which copying has been found to be fair use because it facilitated the identification and location of a specific source material; identification of the *Sun* story did not require the use of the Kunis/Kutcher Image, and Gossip Cop had no desire to help readers locate the story from which the image was taken. *Cf. Authors Guild* v. *Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) (finding a search engine's display of text excerpts to be fair use where those excerpts served to help users identify and locate the full text being excerpted), *cert. denied sub nom. The Authors Guild* v. *Google, Inc.*, 136 S. Ct. 1658 (2016).

Like the Kunis/Kutcher Image, the Pattinson Image was licensed to another outlet (*see* PTX 20), and Defendant had no desire to help readers locate the underlying story. Additionally, the Court once again cannot assess whether the image was sufficiently integral to the story so as to serve as a useful identifier absent evidence of how the underlying article actually used the image.

Quite simply, Defendant's use of the Ross Image is exactly the same as TMZ's — to wit, Defendant presents the photo of Ross without her wedding ring as corroboration for its assertion that Ross was experiencing marital difficulties.  This use is not transformative.

Defendant additionally argued at trial that the use of the Ross Image may nevertheless constitute permissible news reporting, as the image *itself* is the story.  (*See* Tr. 40).  Indeed, the headline of the corresponding Gossip Cop article reads "Rupert Sanders Wife Liberty Ross Spotted Without Wedding Ring (PHOTO)."  The full text of that article reads:

> Rupert Sanders' wife Liberty Ross was spotted without her wedding ring in Los Angeles on Monday.
>
> The model-actress has remained mum since her husband admitted to straying with Kristen Stewart.
>
> Meanwhile, Sanders who expressed in his public apology, "I am praying that we can get through this together," has been photographed still wearing his wedding band.
>
> Sanders and Ross have two young children together.
>
> Gossip Cop has reached out to a rep for Ross for comment.

(PTX 15).  Nothing in Defendant's article imbues the photo with new meaning, or places it in a context different from that in which it was displayed by TMZ. Were this use of the Ross Image considered transformative "news reporting," an entity could take any photograph, announce the photograph's contents, and call that "fair use."  In short, a judicial determination that Gossip Cop's

inclusion of the Ross Image on its website was fair use would promote wholesale circumvention of copyright law.[6]

It is true that news reporting is a widely-recognized ground for finding fair use under the Copyright Act.  The Court has found no case, however, in which the use of an image solely to present the content of that image, in a commercial capacity, was found to be fair.  *See Psihoyos* v. *Nat'l Exam'r*, No. 97 Civ. 7624 (JSM), 1998 WL 336655, at *3 (S.D.N.Y. June 22, 1998) ("The Examiner's use is not transformative, because its piece uses the photo to show what it depicts."); *see also Ringgold* v. *Black Entm't Television, Inc.*, 126 F.3d 70, 79 (2d Cir. 1997) (asking "whether the new work merely supercede[s] the objects of the original creation" (internal quotation marks omitted)).  The Ross Image was a paparazzi photo taken to be used by celebrity news outlets reporting on Ross; Defendant, a celebrity news outlet, used the photo to report on Ross.  Using a photo for the precise reason it was created does not support a finding that the nature and purpose of the use was fair.  *See, e.g., Fitzgerald* v. *CBS Broad., Inc.*, 491 F. Supp. 2d 177, 185 (D. Mass. 2007) (finding a news

---

[6]     Defendant argues that its copying of the Ross Image is fair because the "picture is the story," pointing to *Nunez* v. *Caribbean Int'l News Corp.*, 235 F.3d 18, 22 (1st Cir. 2000), as precedent for that assertion.  (*See* Dkt. #104 at 18-19; Tr. 9:11-12, 12:15-19).  However, Defendant confuses the situation in which the *photograph* is the story, as was the case in *Nunez*, and the scenario present here, in which the *contents* of the photograph are of some public interest.  In *Nunez*, controversy had arisen regarding the propriety of certain photographs having been taken; the existence of the photographs was central to reporting on the controversy, and "[i]t would have been much more difficult to explain the controversy without reproducing the photographs."  *Nunez*, 235 F.3d at 22.  Here, by contrast, the fact of the photograph is not of public interest; rather, it is the photograph's contents that are newsworthy.  Newsworthy contents will rarely justify unlicensed reproduction; were it otherwise, photojournalists would be unable to license photos, and would effectively be out of a job.  *See Harper & Row Publishers, Inc.* v. *Nation Enters.*, 471 U.S. 539, 557-59 (1985).

outlet's use of a photojournalist's image of an arrest for the purpose of reporting on that arrest not transformative, as it used the photograph for the precise reason it was created).

### c.   Defendant's Use Was Commercial

Courts also consider the commercial nature of a secondary use of copyrighted material; "[t]he greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair." *Swatch*, 756 F.3d at 83 (alteration in original) (quoting *Am. Geophysical Union* v. *Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994)); *accord Harper & Row Publishers, Inc.* v. *Nation Enters.*, 471 U.S. 539, 562 (1985) ("The fact that a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding of fair use.").  That being said, "purposes such as criticism, comment, [and] news reporting" are set forth in the Copyright Act as prototypical examples of fair use, 17 U.S.C. § 107, and the Second Circuit has "recognized that '[a]lmost all newspapers, books and magazines are published by commercial enterprises that seek a profit.'" *Swatch*, 756 F.3d at 83 (alteration in original) (quoting *Consumers Union of U.S., Inc.* v. *Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983)). Accordingly, though a work may be commercial in nature, where it is found to be transformative courts "do not place much significance on that fact due to the transformative nature of the work." *Cariou*, 714 F.3d at 708.

The Supreme Court has stated that "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562. That a defendant's use of copyrighted material is for profit bears less weight when that use is highly transformative; but where a defendant's use merely "supersedes the objects" of the original, the commercial nature becomes more relevant. *See Blanch*, 467 F.3d at 254. Gossip Cop used the images at issue to illustrate celebrity gossip stories; this is the same use for which the images were created, and for which other entities pay licensing fees to Plaintiff. Accordingly, because Defendant's use was not transformative, the commercial nature of that use additionally weighs against a finding of fair use.

### ii.    Nature of the Copyrighted Work

The second factor in the fair use inquiry, the nature of the copyrighted work, acknowledges that "some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell,* 510 U.S. at 586; *accord Swatch*, 756 F.3d at 87. As relevant to the instant images, courts consider whether a work is creative versus factual, and unpublished versus published, with copyright protections applying more broadly to creative and unpublished works. *Harper & Row*, 471 U.S. at 563-64; *Blanch*, 467 F.3d at 256 (quoting 2 HOWARD B. ABRAMS, THE LAW OF COPYRIGHT § 15:52 (2006)).

There is no dispute that the instant images were published prior to Defendant's use; indeed, Defendant obtained the photos from third-party publishers.  As for the creativity *vel non* of the instant images, several courts within this Circuit have applied an expansive interpretation of what constitutes a "creative" photograph, stating that an "informational purpose does not negate a finding of imaginativeness or creativity."  *Mathieson* v. *Associated Press*, No. 90 Civ. 6945 (LMM), 1992 WL 164447, at *6 (S.D.N.Y. June 25, 1992); *see also Baraban* v. *Time Warner, Inc.*, No. 99 Civ. 1569 (JSM), 2000 WL 358375, at *4 (S.D.N.Y. Apr. 6, 2000) ("Although photographs are often 'factual or informational in nature,' the art of photography has generally been deemed sufficiently creative to make the second fair use factor weigh in favor of photographer-plaintiffs."); *SHL Imaging, Inc.* v. *Artisan House, Inc.*, 117 F. Supp. 2d 301, 310 (S.D.N.Y. 2000) (characterizing technical decisions regarding camera format, lens, or shutter speed as creative choices).  *But see N. Jersey Media Grp. Inc.* v. *Pirro*, 74 F. Supp. 3d 605, 620 (S.D.N.Y. 2015) (finding a picture taken by a photojournalist to be factual, such that the nature of the image weighed against finding fair use, notwithstanding the fact that the photographer "exhibited great artistry in carrying out his task").  Indeed, a photographer's "efforts to create an aesthetically attractive, technically competent photograph," even of as seemingly banal a subject as fishing gear for a catalog, have been held to be "plainly creative expressions."  *Strauss* v. *Hearst Corp.,* No. 85 Civ. 10017 (CSH), 1988 WL 18932, at *5 (S.D.N.Y. Feb. 19, 1988).

Here, the photographs were unquestionably taken to document their subjects rather than to serve as art pieces — their interest derives from their content, not their composition.  Nevertheless, Plaintiff offered testimony establishing that the photographers had to exercise both technical skill and aesthetic judgment when capturing the subject images, in order to create photographs that captured the necessary information to convey a particular story.  Consequently, the images at issue contain both informational and creative elements, rendering the degree of creativity a relatively neutral consideration; pairing this with the fact of previous publication, the nature of the images tips slightly in Defendant's favor.  *See Bill Graham Archives, LLC.* v. *Dorling Kindersley Ltd.*, 386 F. Supp. 2d 324, 330 (S.D.N.Y. 2005) ("This circuit has mitigated the importance of creativity in the second factor where a work is a published work available to the general public" (internal quotation marks omitted)), *aff'd sub nom. Bill Graham Archives* v. *Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006).  The Court notes, however, that the second fair use factor is "rarely found to be determinative."  *Arrow Prods., LTD.* v. *Weinstein Co. LLC*, 44 F. Supp. 3d 359, 371 (S.D.N.Y. 2014) (citing *Davis* v. *The Gap, Inc.*, 246 F.3d 152, 175 (2d Cir. 2001)); *see also Leibovitz* v. *Paramount Pictures Corp.*, No. 94 Civ. 9144 (LAP), 2000 WL 1010830, at *4 (S.D.N.Y. 2000) ("It is well established that the second factor — the nature of the copyrighted work — is not very important to the fair use analysis.").

### iii.    Amount and Substantiality of the Portion Used

The third fair use factor asks whether "the quantity and value of the materials used [] are reasonable in relation to the purpose of the copying." *Campbell,* 510 U.S. at 586 (internal citations and quotation marks omitted); *accord Castle Rock Entm't* v. *Carol Publ'g Grp.,* 150 F.3d 132, 144 (2d Cir. 1998).  Generally speaking, "the more of a copyrighted work that is taken, the less likely the use is to be fair."  *Infinity Broad. Corp.* v. *Kirkwood*, 150 F.3d 104, 109 (2d Cir. 1998).

The parties agree that Defendant copied the entirety of the three images here at issue.  Accordingly, this factor weighs against a finding of fair use, insofar as it suggests that Defendant made no effort to circumscribe its use such that it reproduced only enough of a particular image to satisfy any reporting needs.  However, because the Court finds that the purpose of Defendant's use was precisely the same as that of the third-party licensees, the question of whether the amount used was "reasonable in relation to the purpose of the copying" must necessarily be answered in the negative.[7]

---

[7]    As noted *supra*, the evidence presented in this matter shows that Defendant used the images as interest-generating illustrations.  However, even were the Court to credit Defendant's use as intended to facilitate identification of the underlying articles, the third factor would still weigh in favor of Plaintiff.  Defendant used the full photographs in large format; in the case of the Ross Image, the photograph takes up nearly as much space as the entirety of the article's text.  In the case of the Kunis/Kutcher and Pattinson Images, the images each vertically span the first three paragraphs of the accompanying articles, and take up 50 percent of the width of the article.  In other words, the images are far larger than necessary to serve as identifying aids.  *Cf. Bill Graham Archives, LLC.* v. *Dorling Kindersley Ltd.*, 386 F. Supp. 2d 324, 330-31 (S.D.N.Y. 2005) (finding the amount and substantiality of use favored fair use where reproduced images were reduced from poster to thumbnail size, sufficient but not greater than necessary for the purposes of the copying), *aff'd sub nom. Bill Graham Archives* v. *Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006).

### iv.   Effect of the Use Upon the Potential Market

The final fair use factor considers "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4). Copyright law serves to protect a copyright holder's ability to benefit from the market for his or her work, as well as from any markets that the copyright holder could reasonably be expected to enter.  *Bill Graham Archives*, 386 F. Supp. 2d at 331.  Thus, when assessing the fourth fair use factor, courts ask whether a defendant's use usurps the market for the copyright holder's work. *See Campbell*, 510 U.S. at 593.

In the instant case, the relevant market for Plaintiff's images consists of the universe of celebrity news reporting outlets; Plaintiff sustains its business by licensing photographs, such as the images at issue here, to third-party reporters who publish celebrity gossip stories.  In regard to the Ross Image, Defendant used the photo in exactly the same manner as any celebrity news site would: To tell a particular story about that particular celebrity.  In regard to the Kunis/Kutcher and Pattinson Images, those photos accompany their corresponding stories as illustrations, though the respective Gossip Cop articles do not make explicitly clear what, exactly, the images are meant to illustrate.  They seem primarily intended to attract interest in the accompanying stories by depicting interesting scenes of famous people; which is, again, the same use for which Plaintiff routinely licenses out its photos. Accordingly, the fourth factor weighs against a finding of fair use.

Considering the fair use factors, three of the four counsel against a finding of fair use. Taken together, the non-transformative purpose and manner of Defendant's commercial use; the fact that Defendant used the images in their entirety; and the potential harm to Plaintiff's business model were such infringement permitted outweigh the fact that Plaintiff's images have some informational elements and were previously published. Accordingly, Defendant has not established that its publication of the images constituted fair use.

### 3. Plaintiff Is Entitled to Statutory Damages

The Copyright Act allows a copyright owner to "elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action." 17 U.S.C. § 504(c)(1). Additionally, where a court finds infringement to be willful, it retains discretion to increase the statutory award up to a maximum amount of $150,000; and, conversely, "where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200." *Id.* § 504(c)(2).

The Second Circuit has established that, in calculating statutory damages for copyright infringement, courts should consider: (i) "the expenses saved and the profits reaped" by the defendant infringer; (ii) "the revenues lost by the plaintiff"; (iii) "the value of the copyright"; (iv) "the deterrent effect on

others besides the defendant"; (v) "whether the defendant's conduct was innocent or willful"; (vi) "whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced"; and (vii) "the potential for discouraging the defendant." *Gucci Am., Inc.* v. *Duty Free Apparel, Ltd.*, 315 F. Supp. 2d 511, 520 (S.D.N.Y.) (quoting *Fitzgerald Pub. Co., Inc.* v. *Baylor Pub. Co.,* 807 F.2d 1110, 1117 (2d Cir. 1986)), *amended in part,* 328 F. Supp. 2d 439 (S.D.N.Y. 2004).  Statutory damages need not equal harm actually incurred by a plaintiff, but they should "bear some relation to actual damages suffered." *Coach, Inc.* v. *O'Brien*, No. 10 Civ. 6071 (JPO) (JLC), 2012 WL 1255276, at *2 (S.D.N.Y. Apr. 13, 2012) (citation omitted, collecting cases).  Courts in this Circuit regularly use some multiple of a work's licensing fee when calculating statutory damage. *Broad. Music, Inc.* v. *Prana Hosp., Inc.*, No. 15 Civ. 1987 (PAE), 2016 WL 280317, at *10 (S.D.N.Y. Jan. 21, 2016) ("Second Circuit case law ... reflects that courts in this Circuit commonly award, in cases of non-innocent infringement, statutory damages of between three and five times the cost of the licensing fees the defendant would have paid"); *see also Realsongs, Universal Music Corp.* v. *3A N. Park Ave. Rest Corp.*, 749 F. Supp. 2d 81, 87 (E.D.N.Y. 2010) (collecting cases).

The Second Circuit has explained that "a court need not find that an infringer acted maliciously to find willful infringement." *Fitzgerald Pub. Co.*, 807 F.2d at 1115.  Rather, "willful" infringement requires only knowledge or reckless disregard on the part of the defendant.  *Id.* (finding that knowledge constitutes willfulness); *accord N.A.S. Imp., Corp.* v. *Chenson Enters., Inc.*, 968

F.2d 250, 252 (2d Cir. 1992); *Island Software & Comput. Serv., Inc.* v. *Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005) (finding that reckless disregard may constitute willfulness); *see also Beastie Boys* v. *Monster Energy Co.*, 66 F. Supp. 3d 424, 439-40 (S.D.N.Y. 2014).  Finally, the Court notes that "it is possible in the same action for a plaintiff not to be able to prove a defendant's willfulness, and, at the same time, for the defendant to be unable to show that it acted innocently," such that an infringer's intent serves to neither increase nor decrease the amount of statutory damages otherwise found to be appropriate.  *Fitzgerald Pub. Co.*, 807 F.2d at 1115.

Plaintiff has elected to pursue statutory damages in this matter, seeking five times the amount of the applicable licensing fee for each image.  Plaintiff has offered evidence of the licensing fees paid by other celebrity news outlets for use of each of the three images in this case: $1,000 for the Kunis/Kutcher Image (PTX 19); $4,000 for the Pattinson Image (PTX 20); [8] and $589 for the Ross Image (PTX 21).  Defendant has not offered, nor has Plaintiff apparently sought, evidence regarding profits Defendant may have reaped as a result of its use of the images — with the exception of a chart presented by Defendant showing daily viewership rates for Defendant's site as a whole, which, standing

---

[8]     The Court notes that the licensing invoice for the Pattinson Image describes the purchased license as "web exclusive 24 hour," suggesting that E! Online was not merely paying for its own ability to use the photograph, but also for the guarantee that no other party would be authorized to electronically publish the photograph for 24 hours. Accordingly, the Court acknowledges that fee might reflect a premium over and above the amount Defendant would have been charged had it subsequently sought Plaintiff's authorization to publish the photograph.  Defendant has not challenged the $4,000 figure, however, and no other evidence has been submitted regarding the fees applicable to the Pattinson Image.  The Court accordingly uses $4,000 as the relevant licensing fee.

on its own, provides the Court with little useful information for the statutory damages analysis.  (DTX B).

As to Defendant's willfulness *vel non*, Defendant has maintained at all times that it believed its publication of the images constituted fair use, as it was using those images not to "break" celebrity news stories, but rather to comment on the truth or falsity of third parties' reporting.  In regard to the Ross Image, Defendant could not reasonably have held such a belief: The text of Defendant's article accompanying that image reads in precisely the same manner as any story on a conventional celebrity news website.  Defendant's story on Ross gives no indication that it is confirming a story previously published on TMZ's site — other than attribution of the photo, there is no mention of TMZ at all.

In regard to the Kunis/Kutcher and Pattinson Images, Defendant's asserted belief in its fair use carries slightly more weight, as Defendant did include the headline from the source websites and comment on the veracity of those websites' respective stories.  Nevertheless, the complete lack of reference to the photographs themselves, both within Defendant's articles and within the articles from which the photographs were taken, significantly undercuts the reasonableness of Defendant's belief in their fair use.  In sum, Defendant's infringement of the Ross Image was willful; and while its infringement of the

Kunis/Kutcher and Pattinson Images was perhaps not clearly willful, but neither was it innocent.

Finally, the Court considers the need to deter unauthorized copying, both by Defendant and by other potential infringers.  As noted, the Court does not dispute Defendant's broader contention that the nature of its website might require the inclusion of certain articles and accompanying images under a fair use theory.  Here, however, allowing Defendant to copy Plaintiff's images directly from third-party licensees and to frame that copying as "news reporting," when Defendant's articles provide no comment on the licensees' use of the respective photographs — and thus, on the facts of this case, add no additional meaning or expression to those photographs — would effectively allow Plaintiff to license its images only once; after an initial licensee published the photo, third parties could then copy it with impunity.  Consequently the need to deter such behavior by Defendant and others factors into the Court's considerations.

In light of the evidence submitted regarding harm to Plaintiff; Defendant's degree of willfulness; and the need to deter future infringement, the Court concludes that Plaintiff is entitled to statutory damages in the amount of five times the licensing fee for the Ross Image, amounting to $2,945;

and three times the licensing fee for each of the Kunis/Kutcher and Pattinson

Images, for totals of $3,000 and $12,000, respectively.

## CONCLUSION

On some level, Defendant has lost the battle, but won the war; this Court

agrees that its website may present images from other articles under a fair use

theory, but concludes that its use of the three images in question did not

constitute fair use.  For the reasons set forth in this Opinion, Defendant is

liable for copyright infringement for each of the three images at issue in this

case, for a total damages award of $17,945.  Defendant is additionally enjoined

from further unauthorized use of the Kunis/Kutcher, Pattinson, and Ross

Images.

Plaintiff may seek attorney's fees and costs pursuant to 17 U.S.C. § 505.

Accordingly, Plaintiff's motion for attorney's fees and costs will be due

**August 5, 2016.**  Defendant's memorandum in opposition will be due

**August 19, 2016.**  Plaintiff's reply will be due **August 26, 2016.**

SO ORDERED.

Dated:      July 20, 2016
            New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge